## N. Y. SUPERIOR COURT.

FRANCES TOLANO, respondent, agt. THE NATIONAL STEAM
NAVIGATION COMPANY, appellants.

An action of *trover* will not lie for the omission of a *common carrier* to deliver prop-
erty, as where the property has been stolen or lost through negligence, and so
cannot be delivered to the owner. The remedy is *assumpsit* or a *special action on
the case*. (McCUNN, J., dissenting : *Holding that section 69 of the Code has abol-
ished all distinctions between the mere forms of actions, and every action is now a spe-
cial action on the case.*)

*General Term, January,* 1868.

APPEAL from a judgment and order denying a new trial.

MR. MORRISON, *for plaintiff.*
MR. VAN COTT, *for defendants.*

ROBERTSON, Ch. J.    The cause of action set out in the
complaint in this case, is a wrongful conversion by the de-
fendants of, and a refusal by them to deliver to the plaintiff,
on a demand by her, a trunk (her property) "containing
plate and other valuable articles, and money." Were it not
that evidence seems to have been admitted without objection
of the value of such *contents,* and the case to have been tried
upon the assumption that the action was brought for *their*
conversion also, it might be doubtful whether *they* could be
recovered for under a complaint so worded.

Under the allegation in the complaint of the "conversion"
of the property in question by the defendants, to their own
use, whether as bailees for hire, or only gratuitous custod-
ians of it, the plaintiff could not recover without proof of an
absolute appropriation of it by the defendants to their own
use, or what is equivalent, parting with it to others without
the authority of the owners. Only in such cases would an
action in the form of *trover* have formerly lain, even against
common carriers. (*Devereaux* agt. *Barclay,* 2 *Barn. and*

*Ald.* 702; *Stephens* agt. *Hart*, 4 *Bing.* 476; *Youl* agt. *Harbottle, Peak Cor.* 49; *Sublock* agt. *Inglis*, 1 *Stark.* 154.)

In a case where a common carrier might have been sought to be made liable, on non-delivery, a special action on the case in a breach of the public duty of carrying safely or of *assumpsit* for a breach of the undertaking so to carry, would have been the only forms of remedy for a mere negligent loss. (*Ross* agt. *Johnson*, 5 *Burr*, 2825; *Aren*, 2 *Salk.* 665.) This constitutes a substantial difference in the cause of action, which the plaintiff was bound to observe in the statement of facts constituting the complaint (*Code of Procedure*, § 142, *sub.* 2) if she seek to recover for mere non-delivery or loss. This in fact the plaintiff conceded, claiming on the argument, however, that such appropriation, in fact, by the defendants, was established by the evidence.

No question is made as to the termination by the compulsory transfer of the plaintiff to the receiving or hospital-ship, Illinois, under the health laws of this state, of the original contract of the defendants, as common carriers, to transport the plaintiff and her baggage to the port of New York, and safely land it and her there; the plaintiff's counsel, not only conceding that it was so terminated, but even claiming that the defendants never had, even during the voyage, the missing property under their charge as carriers, and that they took it from her by compulsion, and against her will, into their custody, and kept it in such a manner that it could not have been lost or stolen, and must, therefore, have been appropriated by them to their own use. A mere compulsory taking of the property from the plaintiff's possession by the defendants, and a refusal to restore it, would have been sufficient without any proof of its subsequent fate, or of a demand to enable her to recover in this action. Proof of want of ordinary care in keeping it, or of actual subsequent appropriation of it to the use of the defendants, would only be necessary in case they had been voluntary bailees without hire.

HARVARD LAW SCHOOL LIBRARY

On the trial, the counsel for the defendants requested the court to charge the jury that they "must find a verdict for the defendants if they found that they did not convert the property in question to their own use," which the learned judge presiding on the trial refused to do, except as he had already charged, to which refusal such counsel excepted.

The learned judge has charged that "the principles applicable to all cases of property lost by carriers are equally applicable to this case, and must be applied with the same rigor as in all others. There is nothing that calls for any relaxation of the rules in this case." And he added: "In my view of the case under the evidence, these defendants are liable for the loss of this trunk. As to the liability for the contents, that is another thing. There is no question at all but that there was such a trunk, and it may be fairly assumed that the trunk was lost." He then submitted to the jury substantially three questions of fact: (1.) What were the contents of such trunk. (2.) Whether the articles of wearing apparel and jewelry claimed by the plaintiff to have been in said trunk when lost were her ordinary and necessary wearing apparel for the voyage; and (3,) whether the sum of $1,200, claimed by her to have been in such trunk when lost, was a reasonable amount of money "for traveling expenses and for staying a few days at a hotel until she could get into business," and instructed them that if they decided the last two questions in favor of the defendants, they should "give her a verdict" for such articles as were in the trunk, except certain ones which he had directed them to disregard as not being necessary either as wearing apparel or for traveling expenses.

The court thus not only evidently put the liability of the defendants upon the ground of their being common carriers, liable at all events for the loss of the property in question upon its non-delivery, and not exempt from liability by proof of any ordinary legally recognized excuse for not delivering at the end of the route, but also refused to charge that

the defendants were not liable unless for a conversion of the property to their own use. This is directly contrary to the principle settled by the authorities already referred to (*vide supra*), and was sufficient error to authorize the granting of a new trial. The plaintiff's counsel seems, however, to have conceded this, and devoted himself to the task of proving that there was sufficient evidence in the case to establish such conversion; either by the compulsory taking of such property out of the plaintiff's possession; or if such taking were peacable and lawful, by the impossibility or violent improbability of its disappearance in any other way under all the circumstances of the case. And as it may be necessary, in case of another trial of this case, to determine what rules of law are applicable under that view, it may be well to look at the evidence. It was not only conceded on the argument, but claimed by the plaintiff's counsel, " that the defendants at no time, as carriers or in any other way, by contract with, or privity or consent of the plaintiff, had charge of the property." This may be assumed to be true up to the time of her leaving the Illinois to go on shore, for both the plaintiff and another witness (Mrs. Young) testify to that effect. The former states that she had had charge of that box during the passage n her "berth," because there were valuable things in it, and "she never allowed it to go out of ' her' possession on board the Helvetia or the Illinois until it was put on the tug-boat;" and again, that this was the only package in her charge. She had no other but that in her charge. She further testified that she had it three weeks in her room on the Illinois. The other witness corroborated her statement as to having it in her charge in her berth during the whole voyage on board of the Helvetia. And the assumption of that care by the plaintiff would have prevented any recovery by her for any loss of any such box during the voyage. (*Cohen* agt. *Frank,* 2 *Duer,* 335).

The first question, therefore, on the evidence, is as to the compulsory taking of such property by the defendants out of the possession of the plaintiff. In applying the evidence

to that point, it is to be assumed that all previous relations between the parties had ceased, and that they stood precisely as if for the first time, the plaintiff being a lodger on board of the Illinois, had parted with the possession of her trunk at the moment of her leaving that vessel to go on shore. The testimony of the plaintiff was, that when the tugboat came alongside, and she was directed to go on board of it to go ashore, her son and herself took such trunk and its contents "to the gangway to bring with them." Mr. Finlay (the alleged agent of the company) said they could not bring their baggage on that boat; it must go on the other tugboat. "They then carried it across to the side to the other tugboat, and it was put on board." They then went ashore on the first boat. This was all done under Mr. Finlay's direction. On cross-examination, she stated that he "said he would not allow any package to be on board where the passengers were." This was corroborated by Mrs. Young and the son of the plaintiff (James Tolano). The latter also testifies that Mr. Finlay, who was acting then as agent of the defendants, receiving and delivering letters, bringing down provisions and the like, came down with two tugs to bring the passengers and baggage on shore. The fact of Finlay's acting as such agent was also testified to by another witness (Gamble), who further states that Finlay brought all the baggage on one tug and carrird the passengers to land on another. After towing the Illinois to her winter quarters by such boats, he removed the passengers on one boat and the baggage on another. He ordered no baggage or package to be taken by the passengers. This was when all were leaving the Illinois to land. He would not permit any of the passengers to have or keep their baggage under their own charge, when landing from the Helvetia. "He prevented them from taking their baggage with them." It was admitted on the trial "that the defendants employed the tugboats to land the passengers and their baggage." This evidence was not essentially varied by any other testi

mony, except that Mr. Finlay testified that he told the passengers that they had to go on the passenger tugboat, and the baggage must go by the other tug, but that any small parcels or valuables he would allow them to take with them; and in this he was corroborated by two other witnesses (Rourke and Peterson). This testimony is apparently not contradicted by any other. The box itself was three feet long and one foot six inches broad. Mr. Finlay also testified that he had the superintendence of the landing of the passengers and baggage from the Helvetia. He took down two boats, one for the passengers, and the other baggage. He had orders from the quarantine commissioners to have the Illinois brought to Gravesend Bay, and there disembark the passengers and the baggage. He wanted to get the passengers to Castle Garden before it was closed, that they might be taken care of during the night. He superintended the transfer of the passengers, and another person (Peterson) had charge of the men that moved the baggage, which he landed on the wharf at Castle Garden and put in an inclosed space.

I am unable to discover in the evidence any forcible dispossession of the plaintiff of such trunk, or any compulsion of her to place it on board of the baggage boat. She was undoubtedly prevented from taking it with her in the passenger boat, but that alone would not have compelled her to put it into the custody of the agents of the defendants, on board of the other boat. She might, for aught that appears to the contrary, have left it on board of the Illinois, and taken another opportunity to land with it in her possession, unless the removal of herself and her baggage, as well as the other passengers, was by authority of the quarantine commissioners, and therefore peremptory, under which, indeed, rather than that of the defendants, Finlay seems to have been acting, as the agent of such public officers. His separation of the passengers from the baggage may have been discreet to prevent any delay in waiting for the latter, which might interfere with such passengers bein landed and housed in

Castle Garden that night. Passengers were notified they might take small packages of valuables, and it does not appear that the plaintiff claimed the trunk to be such. It appears to have been a box of dubious size for holding valuables (unless they were very numerous); at all events the plaintiff, without the least remonstrance, although it contained a great deal of money and valuables, as she stated, and she had it in her berth under her eye the whole voyage, carried it herself to the side of the other tugboat and saw it put on board. No part of this evidence seems to me to be such an assumption of exclusive dominion or control over such box by Finlay, as agent of the defendants, as to make the act of receiving it on board of the baggage boat a conversion by them. If it contained any evidence of it, it should have been submitted to the jury.

But if such delivery was a voluntary bailment without hire, the question of want of ordinary diligence in taking care of the box should have been submitted to the jury, if there was any evidence of it. It seems by the testimony that after being placed on board of the tugboat (the Fletcher), all the baggage was landed as before mentioned, and left in charge of a watchman (Hartman) all night in an inclosure. All of it brought from the Illinois was there next morning, and was again in charge of a watchman (Peterson) all that day, until he was relieved by the previous watchman (Hartman), who remained until the second morning on guard, when the landing agent (Hall) came, who commenced delivering it, after an examination by custom house officers, the plaintiff being present. Such watchman denied the removal of any of the baggage until that time, and the plaintiff's counsel admitted on the argument that such trunk was "so sedulously kept by the vigilance of its custodian that it could not be stolen or abstracted." Nor do I find any evidence of the want of the ordinary precautions taken by prudent men to take care of their property. If there was, it should have

been submitted to the jury, unless downright negligence was proved.

I am not prepared to admit that, upon strong proof of great care of a bailee without hire, in guarding chattels delivered to him, so as almost to exclude the possibility of their disappearance without his connivance, a conversion to his use is to be presumed, or that it is by itself alone sufficient to go to a jury upon this point. At most, it can only be a circumstance to be submitted to the jury, either alone or with others.

Upon either view of the case, therefore, either that of the court, considering the defendants as common carriers, and liable as such, without an appropriation of the property to their use, or that of the plaintiff's counsel, considering the defendants either as *tort feasors*, in taking or afterwards appropriating the goods, or guilty of negligence in taking care of them, there should be a new trial.

The judgment and order denying a new trial must therefore be reversed, and such new trial had, with costs to abide the event.

McCUNN, J. (*dissenting.*) I regret that I must dissent from some of the views set forth in the leading opinion of the court.

The action is to recover $2,892.50, being the value of a small trunk and contents, which the plaintiff alleges the defendants wrongfully took and converted to their own use. The facts are substantially as follows: The plaintiff was a passenger in one of the defendants' steamships (the Helvetia) from Liverpool to this port. On the arrival of the vessel here, it was found necessary to quarantine her, under our laws; consequently the passengers were sent, with all their luggage, to the steamship Illinois, then moored in the lower bay. At the expiration of some eighteen or twenty days, and after quarantine was perfected, the defendants sent their steamtugs and brought the passengers and their baggage to

the city.    The plaintiff had the small trunk, the one out of
which this controversy arose, in her possession, and was
guarding it herself, as she had done all the voyage.    The
defendants took the trunk from her against her will, and
placed her in one tug, and her property, together with this
trunk, on another, to send them to this city.    This was the
last she saw of her trunk, or the articles it contained.    She
demanded her property; the demand was refused.    Hence
this action.

The complaint does not declare against the defendants as
carriers, but simply against them for unlawfully taking and
converting the property; and I hold that, under the circum-
stances, this is the proper form of pleading.

The defendants answer that they are carriers for hire, but
urge, against a recovery, that an action of trover will not lie
for the mere omission of the carrier to deliver, as where the
property has been stolen or lost through negligence, and so
cannot be delivered to the owner.    The remedy, their coun-
sel says, in such case, is assumpsit, or a special action on the
case, and not trover, as he alleges this action is.    Now, the
69th section of the Code has abolished all distinctions
between the mere forms of actions, and every action is now
a special action on the case.    (*Goulet* agt. *Asseler*, 22 *N. Y.
R.* 228.)    The Code (§ 142) requires only a plain and con-
cise statement of the facts constituting a cause of action,
without repetition, and a demand for the requisite relief.
Now, this complaint states concisely and clearly that her
property was taken from her possession without her consent,
and that, although she demanded a return of the same, yet it
has not been returned, and she asks that the court award her
its value.    You may designate the action as an action in tro-
ver, or in assumpsit, or one on the case, or whatever else
you may please to call it.    I hold that nothing more is
requisite in the complaint, and although some may cling to
old and obsolete forms of pleading, yet to the plain mind (I

mean those who seek speedy and substantial justice), and according to the law of the day, this is all that is required.

The learned counsel for the defense, in his effort to establish in the mind of the court that the form of action in this case should have been assumpsit, and not trover, cites a synopsis of the case of *Ross* agt. *Johnson*, to be found in the fifth volume of *Abbott's Digest*, page 243, forgetting this fact, that that authority is a century old, and that we have changed much in the forms of law pleading since then, as well as in all things else. But even in the case of *Ross* agt. *Johnson*, which I find reported at length in the second volume of Lord MANSFIELD's decisions, by *Evans*, that most learned judge declares his disapprobation of nonsuits founded upon objections that have no relation to the merits of the action.

Moreover, Lord MANSFIELD said in that very litigation that the form of the suit should have been an action on the case, which form of action the suit at bar is; and I hold, therefore, that the authority of *Ross* agt. *Johnson* is an authority for the plaintiff. The action herein is not brought specially against the defendants as carriers. The complaint is simply for the taking and conversion of the plaintiff's property, facts which, without reference to form, in themselves constitute a substantial cause of action; and I hold that the court, under such a complaint, taking it in connection with the answer and the proofs in the case, would be justified, without alleging they were carriers, in holding them responsible.

Let us examine briefly what one of the best elementary writers says as to the form of pleading adopted in the complaimt. *Hilliard, on Remedies for Torts*, writing in 1867, says: "In trover against carriers, the declaration need not set forth the duty of the defendants as carriers, if it sets forth his negligence and loss;" and this rule was held in the case of *Wright* agt. *McKee* (37 *Verm.* 161), and was also applied in the case of *Crouch* agt. *The London, &c.* (14 *Eng. Law and Eq.* 498), and these authorities are gleaned from reports

adopted by states where a much stricter line of pleading is applied than in our state since our Code took effect; and I certainly can find no authority wherein this liberal rule is condemned.

The only exception that can be taken to the proceedings had before the judge below is, that in his charge he discussed at some length the law of carriers. Now, while such a discussion could perhaps have been dispensed with, has the course pursued by that learned judge in this respect injured the defendant's case? It certainly has not, and the best evidence of his not injuring defendant's position before the jury in his charge is the fact that not a single exception to that charge was taken. Indeed, the answer, and the whole theory of the defense, was that the defendants were carriers, and were not answerable as such for this special property, and it was only at the request of the defendants' counsel that the court applied the law of carriers at all; so that it would be unjust to have this court apply that rule to the plaintiff in the argument here, when it is clearly seen that the plaintiff's counsel protested against its application throughout at the trial below. Nor can the defendants request the court, at the trial of the issues of fact, to apply a rule of law in their favor against the will of the plaintiff, and then in the appellate court, if that rule is improperly applied, take advantage of its improper application here. But this the defendants' counsel does not seek. In his brief he intimates that the complaint is broad enough to hold the defendants as carriers, and in his answer he relies upon his clients' rights as such carriers; and on the trial at circuit he requested that the rule of law relating to carriers should be strictly applied by the court, and argued that defendants should not be held liable for money or valuables which they did not, in their agreement with plaintiff, as carriers, undertake to protect or forward. And the learned judge did apply the rule as requested, and that in the strictest sense of the word; for he charged the jury that plaintiff could only recover for neces-

sary wearing apparel, and that if she had more money in the
trunk than enough for traveling expenses, she could not
recover the money over. If the complaint had been spe-
cially drawn so as to enable the plaintiff to recover against
defendants as carriers, the case could not have been more
fully developed on the trial below than it has been. The
plaintiff simply declared for taking and converting property.
The defendants answer, "We are carriers for hire between
this port and Liverpool. We did agree to carry you and a
certain quantity of baggage to New York; but you had pro-
perty and money in that trunk of which you concealed from
us a knowledge, and which, under the laws of this state, we,
as carriers, are not responsible for, and therefore you cannot
recover." Now, as I have stated before, the learned judge
allowed this theory of the defense to go to the jury, and
charged the law of carriers correctly, and that in favor of the
defendants; and he submitted the question of necessary wear-
ing apparel, and the proper amount of money for traveling
expenses, to the jury. It will be said, however, that under
the complaint (the complaint being for taking and convert-
ing) final judgment cannot be granted. There are two
answers to this proposition. First, the complaint is broad
enough to hold the defendants as carriers, because it was
optional with the plaintiff to treat the defendants as common
carriers and sue in case for breach of duty, or to ignore their
character as carriers and sue for conversion. She has chosen
the latter, and the action lies. Second, if not broad enough,
the 173d section of the Code allows the court—I mean the
appellate court—and that of its own motion, when it serves
the ends of substantial justice, to make the pleadings conform
to the facts proved on the trial.

The court of appeals applied this rule in the case of *Pratt*
agt. *Hudson River Railroad Company* (21 *N. Y. R.* 305), and
the general term of the supreme court allowed a similar
amendment in the case of *Clark* agt. *Dales* (20 *Barb.* 42).
Not only was this sound rule adopted in the above cases, but

it was strictly applied in all of the following cases: *Coleman* agt. *Plaisted*, 36 *Barb*. 272; *Bowdin* agt. *Coleman*, 3 *Abb*. 431; *Harrower* agt. *Heath*, 19 *Barb*. 331; *Cady* agt. *Allen*, 22 *Barb*. 388; *Bates* agt. *Graham*, 1 *Kernan*, 237. This doctrine was also established in this court in the case of *Foot* agt. *Roberts*, decided at a late general term. In that case Mr. Justice MONELL, in a very clear opinion, establishes beyond a doubt that the court has a right, in all cases where it serves the ends of substantial justice, to make the pleadings conform to the proofs.

It was "in furtherance of justice," as the statute declares, that such a section was added to the Code; I mean the section enabling the appellate court to make such amendments. And surely a case never arose, and never can arise, wherein the statute can be applied and the ends of justice better subserved, than in this case. Let me ask, "What is the amendment, if any, required here?" Why, it simply requires the words "as carriers" to be added after the word "defendant," on line three of folio four of the complaint. It is conceded that, in whatever light we may view this case, all the facts were fully developed on the trial, so as to enable the court to say whether the defendants shall be held liable as carriers, or for taking and converting, and there end the litigation. The learned judge below allowed the defendants and the plaintiff to place all the facts in the case in the fullest light before the jury, and allowed the jury to pass upon those facts; and if there were a thousand trials had hereafter, matters touching the property in controversy could not be made plainer. If this be so, why should the parties be subjected to a new trial, perhaps to a long and exceedingly expensive litigation, when this court sitting here in *banc* can apply a remedy?

Section 173 of the Code, relating to such amendments, was designed, among other things, to shorten litigation, to put an end to suits; and the courts, in all cases where the rule can be applied, should apply it strictly. I think, how-

ever, that the views set forth in the first branch of this opinion are the correct views, and that the complaint, as it stands, is broad enough, and justifies the verdict of the jury.· It is of little consequence whether the defendants took the property as carriers or as individuals; it is enough to sustain the action that they took the property.

What is the object of plain pleading? Why, it is to prevent, among other things, several actions from being brought for the same cause; and when the cause of action is so plainly stated that the facts can be developed at the trial and passed upon in such a form as to end the litigation and prevent new suits for the same cause, this is all that is required, and no one will contend for a moment, after having examined the pleadings in this case, and after so full a development of the facts and circumstances on the trial below, that another action of any kind, especially an action against the defendants as carriers, could be maintained.

I have had no opportunity of consulting with my associate justices, who heard the case (the papers having been submitted to me). Perhaps a discussion of the law and facts by them in my presence, or a knowledge of their views, might have induced me to concur with them about the application of the rules of law; but in the absence of such knowledge, and entertaining the views of the law applicable to such cases I now entertain, I am for affirming the judgment, with costs.